Filed 2/14/14  In re Zachary C. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re ZACHARY  C., a Person Coming Under the Juvenile Court Law. | B249406 |
| | (Los Angeles County Super. Ct. No. CK98383) |
| LOS ANGELES  COUNTY DEPARTMENT  OF CHILDREN  AND FAMILY  SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>MARK C.,<br><br>        Defendant and Appellant. | |

APPEAL  from a judgment  and order of the Superior Court of Los Angeles County, Donna Levin, Referee.  Affirmed.

Frank H. Free, under appointment  by the Court of Appeal,  for Defendant  and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Kimberly Roura, Associate County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Appellant Mark C. (father) appeals from the dependency court's judgment declaring his son, Zachary C., a dependent of the court under Welfare and Institutions Code[1] section 300, subdivision (a). Father contends substantial evidence does not support the sustained jurisdiction allegation or the dispositional order removing the minor from father's custody. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *Detention*

Zachary was born in November 1999. Father and Zachary's mother, Alexandra C. (mother), divorced in September 2010 and have shared equal custody of Zachary on a rotating schedule since that time.

On March 15, 2013, the Department of Children and Family Services (the Department) received a referral, alleging that father had hit Zachary on the head and pulled his hair. The caller stated Zachary was afraid to go home from school with father because he received a bad grade.

Zachary and both parents were present when the Department social worker arrived to investigate the allegations. Zachary appeared healthy with no visible marks or bruises. He had long hair that covered his forehead and ears.

Zachary informed the social worker that he was scheduled to spend the next five days with father under the parents' custody arrangement. He stated there were no loud arguments in father's home, but father often held in his anger then "all of [a] sudden . . . explodes." He reported, " 'Dad has two personalities now; . . . one personality is when he is really nice and the other one is when he is really mad, aggravated and violent.' " (Italics omitted.)

As examples of father becoming violent, Zachary stated father had pulled his hair on two occasions due to misunderstandings. The first time, Zachary explained, occurred because father thought Zachary was lying about a report from school. Zachary stated he

---

[1] All further statutory references are to the Welfare and Institutions Code.

and father had been working on home work when father " 'suddenly rolled over and grabbed [my] hair and started pulling hard; it was pretty hard; I was really stunned; his behavior changed suddenly. I don't know what caused his anger; it was a misunderstanding because he thought I was lying about the numbers on my paper.' "

The second incident occurred when Zachary was walking home from a fast food restaurant. Zachary explained there was a misunderstanding about whether he should stay at the restaurant to be picked up or walk home. When father found him walking home, father " 'got really mad [be]cause he thought I was lying. He grabbed my hair and pulled and started hitting me in the head 3-4 times.' " Zachary stated it felt like father was hitting him with his palm, not his knuckles.

Zachary reported that, most recently, father had threatened to shave his head if he did not get a good grade. He explained father " 'does a lot of threatening like "I'll put an extension cord in your toes." ' " When asked how he felt about going home with father, Zachary stated, " 'I want to talk to him but I am scared to go there.' "

Mother informed the social worker that Zachary had recently been "moody and agitated." Eventually, he pulled mother aside and explained, " 'I gotta tell you something; Dad is angry; he pulled my hair.' " Mother stated Zachary was crying for about an hour after describing the misunderstanding with father and how father had pulled his hair.

Father acknowledged pulling Zachary's hair on two occasions. When asked for details, father stated, " 'I grabbed him from [the] back of his hair and pulled him over to me.' " Father explained that he was " 'tired of excuses' " and said, " 'at times this discipline works. They did it to us when [we] were young. I put pressure on homework and he comes up with excuses.' " Regarding the second incident when father found Zachary walking home from the fast food restaurant, father explained that Zachary " 'came up with dumb excuses and I grabbed his hair and pulled it a foot and [a] half.' " Father denied hitting Zachary.

3

Father also acknowledged threatening to shave Zachary's hair. He stated, " 'if he fails[,] I am gonna send him to [the] barber . . . . There should not be any reason for failing unless he is hiding something . . . .' "

When asked if he would agree to forego his scheduled visit with Zachary to give the social worker more time to investigate the referral, father refused. Based on Zachary's statements concerning father's physical and emotional abuse, the social worker detained Zachary and released him to mother's custody.

On March 20, 2013, the Department filed a juvenile dependency petition, asserting jurisdiction under section 300, subdivision (a), based on allegations that father physically abused Zachary by grabbing and pulling his hair.[2] The juvenile court ordered Zachary detained from father and released to mother. Father was granted monitored visits twice per week.

2. *Jurisdiction/Disposition Report*

Following the detention, the Department conducted further interviews concerning the alleged incidents of physical abuse. Father reaffirmed that he had pulled Zachary's hair on two occasions—once when he thought Zachary was "lying" about school work and again when Zachary " 'was supposed to come home from school and he was out playing with his friends.' " With respect to Zachary's school work, father stated: " '[Zachary] thought that a daily report mentioning that he was talking in class was a good grade. I pulled his hair and told him that it wasn't a good grade. I usually pull his hair near the back of his head and pull upward. I told him that talking in class was not a

---

[2]     The petition also included allegations under section 300, subdivision (b), that father had failed to protect Zachary by (1) subjecting Zachary to physical abuse (grabbing and pulling his hair); (2) giving Zachary a dosage of father's psychotropic medication; (3) driving a motorcycle with Zachary as a passenger while under the influence of alcohol; (4) caring for Zachary while under the influence of alcohol; and (5) failing to take prescribed psychotropic medications, thereby subjecting Zachary to risk of harm from father's alleged mental and emotional problems. The juvenile court dismissed the subdivision (b) allegations and we have not considered them in our analysis of the sustained allegation under section 300, subdivision (a).

4

good grade. I used just enough force to hurt. After that, he backed down on saying talking was a good grade.' "

Father's girlfriend was present at the time. She reported father " 'was upset after he did it. He thought about it and he was crying after Zach went to bed because he was upset that he did that and had such frustration. Zach was shocked and upset. That was the first time that [father] ever did something like that.' "

As for the second incident, father reported Zachary had been out playing with friends when he was supposed to come home from school. After finding Zachary walking home, despite instructions to stay at a restaurant to be picked up, father stated: " 'I reached over and pulled his hair and said, "What makes you think it's okay to be playing when you need to get your work done?" . . . I grabbed his hair in the same place and pulled up. . . . I just got his attention. It was just enough to hurt. I know when it is just enough to hurt by the change in the facial expression. I pulled his hair because it is something that he is sensitive to and anyone is sensitive to. I know that it gets his attention and it doesn't leave a mark, so that's what I used. At times, I feel it (pulling hair) is appropriate if a kid doesn't listen. I don't see the risk of physical harm because no hair was pulled out; it was just enough to get his attention.' "

Regarding this incident, Zachary stated that father thought he was " 'playing dumb . . . and [father's] face got really red and he got really mad.' " He reported that father " 'reached over and grabbed the back of my hair and he pulled me and hit me with his palm and hit me three times.' " Zachary stated he " 'held back [his] tears' " and did his homework.

### 3. *Adjudication Hearing*

The adjudication hearing was held on May 2, 2013. Zachary's counsel joined the Department in arguing the petition should be sustained under section 300, subdivision (a). Counsel argued father's physical abuse was escalating and father exhibited a lack of impulse control, as evidenced by the fact that the second incident of hair pulling was followed by strikes to Zachary's head with an open palm.

5

The juvenile court sustained the count for physical abuse under section 300, subdivision (a), and declared Zachary a dependent of the court. The court found the "hair-pulling [was] quite harsh," noting "[t]he child described it and the father admits to it, and he did it in anger."

On disposition, father's counsel argued father would abide by a court order not to use physical discipline and noted that father had started parenting classes. Zachary's counsel joined the Department in requesting removal with monitored visits, arguing again that the second incident involved strikes to Zachary's head and was a clear sign of "escalation." Counsel argued there needed to be "a period of deescalation for Zachary and father to mend their relationship between conjoint counseling sessions before [father] regains custody."

The court agreed with Zachary's counsel and ordered Zachary removed from father pursuant to section 361, subdivision (c), and placed with mother. Family maintenance services were ordered, and father also was ordered to participate in anger management, conjoint counseling with Zachary, and an age-appropriate parenting class. Father was granted monitored visitation.

## DISCUSSION

1. *Substantial Evidence Supports Jurisdiction*

Father contends the jurisdictional finding is not supported by substantial evidence that Zachary suffered, or was at a substantial risk of suffering, serious physical harm. We disagree.

In reviewing the juvenile court's jurisdictional findings, "we look to see if substantial evidence, contradicted or uncontradicted, supports them. [Citation.] In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; [and] we review the record in the light most favorable to the court's determinations . . . ." (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.) Thus, the pertinent

inquiry is whether substantial evidence supports the finding, not whether a contrary finding might have been made.  (*In re Dakota H.* (2005) 132 Cal.App.4th  212, 228.)

Section 300, subdivision (a) authorizes jurisdiction where there is evidence "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian.  For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm. . . . '[S]erious physical harm' does not include reasonable and age-appropriate spanking to the buttocks where there is no evidence of serious physical injury."  (§ 300, subd. (a).)

Father argues there was no evidence of serious physical harm because "Zachary did not indicate that either incident"—i.e., the instances of hair pulling and striking Zachary on the head—"caused him pain, nor was there any evidence of damage."  Contrary to father's contention, Zachary reported that father pulled his hair "pretty hard," and that he "held back [his] tears" after father struck his head.  Father admitted he pulled Zachary's hair "enough to hurt," as confirmed by "a change in [Zachary's] facial expression."  Indeed, father indicated that he pulled Zachary's hair with such force that he physically moved Zachary's head and body by his hair.  Father stated, " 'I grabbed him from [the] back of his hair and *pulled him over to me*' " and " 'I grabbed his hair and *pulled it a foot and [a] half*.' "  (Italics added.)  This evidence supports a reasonable inference that Zachary suffered serious physical harm.

We also reject father's implicit contention that a finding of serious physical harm requires visible "evidence of damage."  Father distinguishes his conduct from cases such as *In re David H.* (2008) 165 Cal.App.4th  1626, where the mother struck the child with a belt and electrical cord, leaving "bruises, linear red marks, welts and broken skin" (*id.* at p. 1645), and *In re Tania S.* (1992) 5 Cal.App.4th  728, where the parents spanked their children with a wooden paddle, sometimes leaving welts and marks (*id.* at p. 734). Were

visible marks necessary to find serious harm, myriad forms of physical abuse would evade juvenile court jurisdiction. Father himself indicates he pulls Zachary's hair because " 'it is something that he is sensitive to' " and " ;it doesn't leave a mark.' " So long as " 'no hair was pulled out,' " father stated, " 'I don't see the risk of physical harm.' " Inasmuch as "[t]he purpose of dependency proceedings is to prevent risk, not ignore it" (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1004), we cannot accept a rule that requires visible marks or welts on a child before the court may exercise jurisdiction.

Finally, substantial evidence supports the juvenile court's finding that a substantial risk of future physical abuse existed. Unlike *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, where "the mother admitted and regretted" an isolated incident of striking her child and there were "no further allegations nor supporting facts to suggest the serious physical harm inflicted by the mother [would] occur again" (*id.* at pp. 1134-1135), here, the juvenile court was faced with two reported incidents of physical abuse, the second of which involved an escalation from hair pulling to striking Zachary on the head three or four times.

The evidence also suggests, as the juvenile court found, that these incidents were not calculated acts of measured discipline, but rather stemmed from sudden outbursts of anger and an apparent lack of impulse control on father's part. For instance, even after father expressed remorse to his girlfriend about pulling Zachary's hair in a fit of "frustration," father pulled Zachary's hair again, in anger, over Zachary leaving the restaurant where he was to be picked up—this time also striking Zachary on the head multiple times. Zachary stated father suppressed his anger until " 'all of [a] sudden it explodes,' " and described father as having " 'two personalities' "—one in which " 'he is really nice' " and the other in which " 'he is really mad, aggravated and violent.' " (Italics omitted.) Based on this evidence, and the escalation in father's physical expressions of his anger, the juvenile court could reasonably find a substantial risk that father might act again in anger, perhaps with more serious consequences.

2.      *Substantial Evidence Supports the Disposition Order*

Father contends the juvenile court's order removing Zachary from his physical custody was not supported by "clear and convincing evidence" and that reasonable means short of removal from custody existed to protect Zachary. We find the record supports the juvenile court's order.

Before a dependent child may be taken from the physical custody of a parent, section 361, subdivision (c)(1) requires the juvenile court to find "clear and convincing evidence" of "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the [parent's] physical custody."

Notwithstanding section 361's heightened proof requirement, "on appeal, the substantial evidence test applies to determine the existence of the clear and convincing standard of proof, the same as in other cases." (*In re Amos L.* (1981) 124 Cal.App.3d 1031, 1038.) "The 'clear and convincing' standard . . . is for the edification and guidance of the trial court and not a standard for appellate review. . . . [O]n appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' " (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 880-881.)

As we discussed in the preceding section, substantial evidence supports the juvenile court's finding that a substantial danger exists of future physical abuse by father. This same evidence—namely, the two reported incidents of abuse, the fact that the second incident involved an escalation from hair pulling to striking Zachary's head multiple times, and the evidence suggesting father acted out of anger and a lack of impulse control—supports the finding that there would be a substantial danger to Zachary's physical well-being were he returned to father's custody.

That evidence also supports the juvenile court's conclusion that no other reasonable means existed to protect Zachary's physical health and safety. Father argues the juvenile court could have ordered him to refrain from using physical discipline. And, "[s]ince the only evidence that [father] expressed his temper physically was the pair of hair-pulling incidents," father contends "the court had reason for confidence that [father] would have complied with such an order." The contention ignores the escalating nature of father's physical expressions of anger. Setting this aside, father's argument admits the very evidence that supports the juvenile court's determination—that is, the evidence demonstrated, on at least two occasions, that father was unable to control his temper enough to refrain from physically abusive outbursts towards Zachary.

Though we are mindful of evidence showing that Zachary generally was well-cared-for in father's custody, the record clearly supports the juvenile court's findings that physical separation was necessary to protect Zachary and reunification services should progress before returning Zachary to father's custody.

## DISPOSITION

The judgment and disposition order are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

ALDRICH, J.

10